**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Bankruptcy Case No. 22-3672 |
| | ) | |
| Gamal Naguib and Analida Naguib, | ) | Hon. Janet S. Baer |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | (Dupage County) |

**RESPONSE TO MOTION FOR EQUITABLE TOLLING**
**OF THE LIMITATIONS PERIODOF CODE SECTION 546(a)(1)(A)**

Now Comes Gamal S. Naguib ("Dr. Naguib" or "Debtor(s)"), by and through his counsel

Konstantine Sparagis, of the Law Offices of Konstantine Sparagis, PC, and as their response to

the Motion for Equitable Tolling ("Motion"), states as follows:

**SYNOPSIS OF ARGUMENT**

1.       This Court granted the Trustee's Motion requesting prospective equitable tolling

of the statute of limitations under Section 546 on one week's notice, without briefing the issue

and without conducting an evidentiary hearing based exclusively on the Trustee's Motion.  The

Motion itself does not come remotely close to satisfying the standards for the extraordinary relief

requested. The Debtors posit that, by granting the Motion not only the Debtors', but prospective

defendants' due process rights have been trampled and that such parties are now potentially and

unwittingly bound by the Court's ruling as law of the case without having the benefit of even

addressing the Court in the context of a live controversy and pending adversary.

2.       As argued at the presentment of the Motion, the Debtors posit that the correct

result procedurally and substantively would have been to deny the motion without prejudice,

allow the Trustee to file any suits which he believed equitable tolling should apply after March

30, 2024, and afford the prospective defendants the opportunity to attack the complaint by a

motion to dismiss on statute of limitations grounds with the Trustee reserving the opportunity to contest dismissal on the basis of equitable grounds which would toll the limitations period.  This would have simultaneously protected the rights of all parties – including the Trustee as to any specific claims that he believed were appropriately the subject of an equitable tolling defense without prejudicing the rights of the Debtors or other third parties.

3.      The Court's ruling, however, does not apply only to undiscovered claims. Indeed, the Court's ruling effectively extended the deadline *en masse* for all claims whether known or unknown. Here, the Trustee admits that he knew of at least some claims that could have been filed, but were not filed prior to the deadline. The Debtors posit, however, that equitable tolling applies only to claims that the Trustee – despite all due diligence – could not discover prior to March 30, 2024.

## BACKGROUND

4.      In August 2016, Dr. Iglesias filed suit against Gamal Naguib, Analida Naguib, and Masterpiece Corporation in state court as case no: 2016CH10564 ("State Court Case") asserting that Masterpiece and Dr. Naguib perpetrated a securities fraud on Iglesias. On March 30, 2022, ("Petition Date"), the Debtors filed their pending voluntary petition for relief under chapter 7 of title 11 of the United States Code ("Bankruptcy Code") and Frank Kocoszka was appointed the trustee ("Trustee"). On October 2, 2022, the Debtors received their discharge.

5.      During the State Court Case, Iglesias received either by direct production by the Defendants or through subpoena almost 17,000 pages of financial documents and records covering the period 1985 to 2018. See **Exhibit A** to Debtor's Response [Dkt. 108] which is attached hereto as **Exhibit 1**, a summary of documents produced in connection with State Court and Bankruptcy proceedings through the date of the Response.

6.      In this case, the Debtors attended and testified at two 341 meetings of creditors on May 2, 2022 and May 12, 2022, respectively.

7.      In anticipation of the first meeting of creditors and prior to the second meeting of creditors, (less than 10 days later), the Debtors voluntarily produced to the Trustee an additional 600 pages of financial documents and records for periods covering 2019 – 2022.  See Ex. A to **Exhibit 1**.

8.      Since May 12, 2022, the Trustee has never requested any further information or documents from the Debtors; has not issued any Rule 2004 examinations; and has not filed any motion seeking to compel the cooperation of the Debtors (or their family or businesses) as evidenced by the Docket.

9.      Twenty-one months later, on February 15, 2024, the Trustee filed a motion to employ his firm for the purpose of investigating and prosecuting avoidance actions.  [Dkt # 135]. The order was granted employing K&J on February 26, 2024. [Dkt. #137].

10.     On March 1, 2024, a mere 29 days prior to the expiration the statute of limitations, the Trustee filed his motion to employ Mr. Factor's office as counsel.  [Dkt # 138]. The order employing Mr. Factor's firm was entered on March 8, 2024. [Dkt #140].

11.     On March 22, 2024, Mr. Factor's office filed a motion to equitably toll the limitations period ("Motion").  [Dkt. # 141].  On only 7 days' notice and without being provided an opportunity to respond in writing to this extraordinary request for relief, the Court granted the Motion.

12.     Prior to March 25, 2024, the undersigned counsel arranged for the depositions of the Debtors' adult children – James and Deborah and notified Mr. Factor that the Debtor could not appear due to health issues.  See **Exhibit 2**. James' deposition proceeded in due course,

however, during Deborah's deposition, the parties were forced to unexpectedly stop the deposition due to her own medical issues. See **Exhibit 3**.

13. The Trustee's Motion is smattered with broad and conclusory allegations asserting pre-petition fraud by the Debtor or Masterpiece. [Mot. ¶¶ 4 & 5]. These statements are legal argument not evidentiary facts and totally unsupported but also irrelevant to the issue presented to the Court.

14. The Motion does not describe <u>any</u> efforts by the Trustee to obtain documents from the Debtor or his businesses or how the Trustee was delayed or thwarted in his investigative efforts. Rather, the Motion focuses on Mr. Factor's efforts as counsel for Iglesias which commenced belatedly in August 2023 after Iglesias changed counsel. [Mot. ¶ 8]. The Trustee further focuses on an 11 day delay by the Debtor and his family members between the February 9, 2024 due date under the 2004 Order and the actual date of production on February 20, 2024 for documents for which they were required to search going back to 2017. [Mot. ¶¶ 12 & 13]. The Motion concludes that notwithstanding the delays by the Debtor that prior to the expiration of the 2 year limitations period, "**the Trustee has identified numerous prepetition transactions which the Trustee understands and believes may give rise to potential claims arising under sections 544, 547, or 548 of the Bankruptcy Code which may be held by the estate**." (emphasis added).

## ARGUMENT

### I. **Equitable Tolling is a Drastic Remedy**

15. The Trustee cites Code Section 546 as the sole authority for extending the deadline of March 30, 2024. However, Section 546 provides no legal basis or statutory

authorization for extension of the two-year deadline.  Specifically, regarding the time limitation

for bringing an avoidance action, the statute provides:

> (a)  An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not
> be commenced after the earlier of–
> (1) the later of–
> (A)  2 years after the entry of the order for relief.

11 U.S.C. 546(a)

Section 546 provides only for the limitation, not the extension of time to file avoidance

claims.  There is simply no statutory authority in Section 546 that permits this Court to grant the

Motion as requested by the Trustee.

16.     For over 100 years, the Supreme Court has applied equitable tolling in bankruptcy

cases to belatedly discovered fraudulent transfer claims.  *Bailey v. Glover*, 88 U.S. 342, 22 L. Ed.

636 (1874).   While well recognized, it is an extraordinary remedy "limited to rare and

exceptional circumstances" and "typically applied sparingly." *Hunter v. Ferrell*, 587 F.3d 1304,

1308 (11th Cir. 2009). In *Young*, the Supreme Court identified equitable tolling as applicable to

circumstances "where the claimant has actively pursued his judicial remedies by filing a

defective pleading during the statutory period, or where the complainant has been induced or

tricked by his adversary's misconduct into allowing the filing deadline to pass." *Id*.   Further, in

*CTS Corp.* the Supreme Court described the applicability of the doctrine to circumstances "***when

a litigant has pursued his rights diligently but some extraordinary circumstance prevents him

from bringing a timely action***." *CTS Corp. v. Waldburger*, 573 U.S. 1, 9 (2014). (emphasis

added).

17.     Like most equitable principles, the concepts of equitable tolling, equitable

estoppel, and the discovery rule have been sometimes intermingled by the courts. Bankruptcy

court as a forum presents a somewhat unique setting because unlike typical litigation the debtor

is required to identify under oath all assets, claims and income, thus, providing the Trustee and creditors with a proverbial road map where assets are located or if they've been disposed, sold or transferred. Also, as recognized by some courts, trustees are not typical litigants.  Indeed, they have a duty to investigate the debtor and their financial affairs and unlike other litigants have a two-year runway to investigate debtors armed with extensive powers under the Bankruptcy Code to obtain disclosures, documents and testimony.

18.     Accordingly, in most bankruptcy cases, the focus of the analysis is simultaneously on the actions and conduct of both the trustee and the debtor.  In the first instance, courts look at the conduct of the Trustee to determine whether the Trustee diligently pursued their rights potentially entitling them to equitable relief.  The analysis is consistent with general equitable principles that a litigant cannot sit on his rights, fail to diligently pursue their claims and then, belatedly rely on equitable grounds to save the claim.  *In re United Ins. Mgmt., Inc.*, 14 F.3d 1380, 1386 (9th Cir. 1994) (holding that one who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence.). Second, the analysis focuses on what extraordinary circumstance – or interference caused by the debtor prevented the trustee from timely bringing the action.

**A**.     **Trustee Did Not Act with Due Diligence**

19.     While courts have applied the equitable tolling doctrine where evidence has been concealed or the trustee misled, courts "have not been so generous where one does not act diligently in protecting his legal rights." *In re Higgins*, 270 B.R. 147, 158 (Bankr. S.D.N.Y. 2001).  Bankruptcy trustees are held to different standards when it comes to establishing their "due diligence."  In *United Ins*., the 9th Circuit emphasized this point outlining the analysis thoroughly and succinctly, as follows:

> Because a chapter 7 trustee has a statutory obligation to "investigate the financial affairs of the debtor[, ...] collect and reduce to money the property of the estate ..., and close such estate as expeditiously as is compatible with the best interests of parties in interest," 11 U.S.C. §§ 704(1), (4), ***equitable tolling's requirement of diligence is particularly acute in the bankruptcy context***. Included within a trustee's statutory obligations are the duty to examine the debtor's books and records, *see In re Island Amusement, Inc.,* 74 B.R. 18, 20 (Bankr.D.P.R.1987), and to investigate and litigate potential lawsuits that might be brought on behalf of the debtor, *see Mele v. First Colony Life Ins. Co.,* 127 B.R. 82, 86 (D.D.C.1991). Failure to perform these duties expeditiously subjects the trustee to removal, *see Island Amusement,* 74 B.R. at 20, forfeiture of fees, *see Estes & Hoyt v. Crake (In re Riverside–Linden Inv. Co.),* 925 F.2d 320, 322 (9th Cir.1991), or liability for damages, *see Hall v. Perry (In re Cochise College Park, Inc.),* 703 F.2d 1339, 1357 (9th Cir.1983). (emphasis added).

*In re United Ins. Mgmt., Inc.*, 14 F.3d 1380, 1386 (9th Cir. 1994).

There, the appeals court affirmed the ruling that the trustee failed to act diligently even though the trustee filed an unsuccessful state court suit, requested documents and took examinations of third parties. *Id*. Regardless, the 9th Circuit held that the failure to perform his duties more diligently nullified the trustee's ability to invoke the doctrine of equitable tolling. *Id*. Here, the Trustee conducted two 341 meetings, requested and received documents from the Debtors and then, took no action for almost 2 years. We do not mean to criticize the Trustee's actions in this case *per se* as the Debtors suspect the motivating force behind this flurry of activity is Iglesias – not the Trustee. Regardless, there is no evidence or even argument in the Motion addressing the Trustee's efforts or due diligence and the Motion simply cannot provide the foundation for the Court's ruling.

### B.    The Motion Does Not Evidence Any Extraordinary Interference or Delay by the Debtor in the Trustee's Investigation Efforts

20.    The Debtors have outlined above their objective cooperation with the Trustee throughout the case which is reflected in the docket. The Debtors attended their meetings of creditors, produced voluminous documents to the Trustee (and Iglesias for that matter) and were never the subject of any motion to coerce or compel their cooperation. Indeed, the Debtors have

participated extensively in these proceedings, but notably, there have been no attacks on the disclosures made in their petition, schedules, or statement of financial affairs. Other than broad and conclusory argument that the Debtors committed some fraud or concealed assets from the Trustee, there is not one iota of evidence in the Motion that would justify the Court arriving at that conclusion. The Debtors can appreciate that the Court seemingly faced at the eleventh hour with the proposition that the Court was required to extend the deadline otherwise, the claims would be forever lost. However, this is precisely the situation that equitable tolling was designed to guard against – after the limitations period had passed.

21.     The Motion seems to criticize the Debtor's legitimate defense of Iglesias' motions for 2004 Examinations and subpoenas requests. The Debtors posit that contesting Rule 2004 Motions or moving to quash overly broad and onerous subpoenas cannot possibly be asserted prejudicially against the Debtors. Indeed, the Debtors have an absolute right and obligation under the Federal Rules to timely file objections, respond to motions and defend their rights in contested litigation. For the Court to grant the Trustee's Motion, it would have to find that the Debtors' exercise of their rights was tantamount to intentional and deceptive obstruction.

22.     Further, as further evidence of delay, the Trustee sheepishly points to the Debtors' 11 day delay in producing documents. (Mot. ⁋ 12 & 13). Again, the parties voluntarily complied with the requests and no motion was filed to compel production, but moreover, an 11 day delay is neither extraordinary nor egregious conduct and hardly a basis for justifying the relief requested by the Trustee.

23.     Finally on this subject – the Trustee fails to identify any specific fraudulent concealment by the Debtors of any purported fraudulent transfers. If the trustee is relying on active concealment by the Debtors, the Trustee must identify the specific conduct by the Debtors

that deceived him.  The Debtors could not have actively concealed transactions that were not required to be disclosed under the petition or that they were not asked about under oath.  See In re Lyons, 130 B.R. 272 (Bankr. N.D. Ill. 1991).  In *Lyons*, the court held that "fraudulent concealment must consist of affirmative acts or representations which are calculated to, and in fact do, prevent the discovery of the cause of action." Id. at 280.  Indeed, mere silence of the defendant and failure of the plaintiff to learn of the right of action, alone, were not sufficient. *Id*.

**II.  Equitable Tolling Does Not Apply Prospectively**

24.    Historically, the doctrine of equitable tolling has been raised as a defense to a statute of limitations attack after a complaint has been filed.  The doctrine "creates a defense to statutes of limitations and other non-jurisdictional filing deadlines for cases in which, despite due diligence, the plaintiff cannot sue within the statutory deadline ...." *Sparre v. United States Dep't of Lab., Admin. Rev. Bd.,* 924 F.3d 398, 402 (7th Cir. 2019) citing to *Yuan Gao v. Mukasey*, 519 F.3d 376, 377 (7th Cir. 2008).  See also, *Calloway v. AT & T Corp.*, 419 F. Supp. 3d 1031, 1033 (N.D. Ill. 2019) (rejecting *en masse* prospective application of equitable tolling recognizing that the doctrine of equitable tolling creates a defense to statute of limitations.).

25.    The Debtors' position is supported by the *Walnut Hill* case. *In re Walnut Hill, Inc*., No. 16-20960 (JJT), 2018 WL 2672242, at *1 (Bankr. D. Conn. June 1, 2018). There, analogous to this case, the chapter 7 trustee moved for prospective equitable tolling prior to the expiration of the 2 year limitations period in Section 546, which the court summarily rejected. *Id*. at *2. There, the court noted that "procedurally, the doctrine of equitable tolling is recognized as a response to a statute of limitations defense asserted in a pending litigation." *Id*. citing to *Long v. Abbott Mortg. Corp.*, 459 F. Supp. 108, 113 (D. Conn. 1978). The court concluded, that because no adversary was pending and the deadline had not yet passed that "[i]t is wholly

premature and procedurally flawed to address equitable tolling outside the context of an evidentiary hearing on the facts and circumstances to be proven in the adversary proceeding against specific defendants, once a statute of limitations defense has been asserted." *Id*.

26.    Similarly, in *Cramer*, the court relying on the *Walnut Hill* rejected the prospective application of the equitable tolling doctrine. *In re Cramer*, 636 B.R. 830 (Bankr. C.D. Cal. 2022).  There, similar to the case at bar, the trustee in the face of a rapidly expiring statute of limitations moved for prospective equitable tolling by asserting that the debtor had been insufficiently responsive in the trustee's investigation.  *Id*. at 831. The court denied the motion finding that "no basis in law exists for such a motion." *Id*.  Moreover, the court held that "[t]he Federal Rules of Bankruptcy Procedure contain no rule to extend statutory deadlines such as the ones in sections 546 & 549. No procedure supports the relief in the current motion."  *Id*. at 831. There, while acknowledging the power of a court to toll limitation periods based on equitable grounds after the limitations period has expired the court expressed grave concern that doing so prospectively on an ex parte basis created the potential for due process and estoppel concerns for prospective defendants that had no notice or ability to contest the motions based upon case specific circumstances.  *Id.* at 832-33.

27.    Both *Cramer* and *Walnut Hill* acknowledge and reject *In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, (11th Cir. 2005) analyzing the flawed logic and severe prejudice to the rights of potential defendants by the prospective application of equitable tolling to the limitations periods in Section 546.  But moreover, *Int'l Admin. Servs*. can be easily distinguished from the case at bar on other grounds.  There, the bankruptcy court found after an evidentiary hearing and before granting relief, that the trustee "worked long and hard to discover all the intricacies of IAS' and Givens' asset diversion plan." *Id*. at 702.  Further, that the debtor "went to extreme

lengths to hide their activities," and that the case was "replete with discovery violations, mostly in the form of the Debtor and its associates' refusals to supply the Trustee with critical and important documentation." *Id*. Accordingly, there, the trustee adequately demonstrated that he acted with due diligence to discover the concealed fraud and that the debtor took positive steps to conceal the transfers. *Id*.

28.     Here, however, there was no due process, no evidentiary hearing and the Court granted the extraordinary relief based on the date of presentment of the motion. Further, unlike the debtor in the *Int'l. Admin. Svcs*., here there are no allegations – let alone evidence – of active concealment of any fraud by the debtor or his children, and no orders for discovery violations or active hinderance of the Trustee's investigative efforts by the Debtors. Indeed, the sole "hinderance" even remotely alluded to in the Motion is the legitimate opposition to Rule 2004 Motions and overreaching subpoenas directed to the Debtor and his children which the Debtor was successful in limiting.

## III.    There is No Basis for Enlarging the Limitations Period Under Code Section 546 Pursuant to Fed. Bankr. R. 9006

29.     Rule 9006(b) allows for enlargement or extension of certain deadlines when cause is shown. However, by its plain language, Rule 9006(b) only applies to deadlines set "by these rules or by a notice given thereunder or by order of court." Fed. Barnk. R. 9006(b). Accordingly, Rule 9006(b) refers to and authorizes extension of time under bankruptcy rules of procedure or court orders – not to statutory deadlines such as in Section 546(a).

30.     Based on the Debtor's research, no case in this Circuit has addressed the specific issue related to Section 546 presented to the Court. However, the *Sykes* court denied a creditor's request to toll a claim filing deadline under Rule 9006 because it would impermissibly alter a statutory deadline under the Code. There, the *Sykes* court held that:

The Supreme Court has recognized that "statutory filing deadlines are generally subject to the defenses of waiver, estoppel and equitable tolling." *United States v. Locke,* 471 U.S. 84, 94 n. 10, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985). However, the tolling doctrine is not permitted where to do so would be "inconsistent with the text of the relevant statute." *United States v. Beggerly,* 524 U.S. 38, 48, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998).

*In re Sykes*, 451 B.R. 852, 860 (Bankr. S.D. Ill. 2011)

31.     Several courts presented the same issue have held that Rule 9006 cannot be used to toll or extend the deadlines under Section 546.  See *In re Damach, Inc.*, 235 B.R. 727, 731 (Bankr. D. Conn. 1999) (holding that Rule 9006(b) does not permit a court to extend a time limitation set by Congress in a statute.) In *Colad Group*, the bankruptcy court held that Bankruptcy Rule 9006 allows an enlargement or reduction of many of the time limits in the Bankruptcy Rules, but that Section 546(a) is a statute, not a rule. *In re Colad Group, Inc.*, 324 B.R. 208, 225 (Bankr. W.D.N.Y. 2005). Consequently, there, the court held that it did not have the authority to act under Rule 9006 to extend statutory deadlines.  See also, *In re Walnut Hill, Inc.*, No. 16-20960 (JJT), 2018 WL 2672242, at *1 (Bankr. D. Conn. June 1, 2018) holding that "Rule 9006(b) cannot apply to Section 546(a) without violating the separation of powers preserved in the Constitution. Where the legislature has spoken authoritatively, it is not within the province of the judiciary to modify its determination. As Rule 9006(b) does not apply to Section 546(a), it is unnecessary for this Court to determine whether cause was shown for an extension of the statutory deadline." *Id.* at *2.

### IV. Parties with Notice of Claims Prior to the Expiration of the Statute of Limitations Should Raise Them Timely

32.     The Trustee unequivocally references known claims of which he had notice prior to the running of the limitations period.  Statutes of limitations are not suggestions.  The Debtors posit that any claims which he knew prior to March 30, 2024, should have been timely filed

otherwise, they are subject to bar on the basis of statute of limitations defense.  This is consistent

with Seventh Circuit cases confronted with equitable tolling claims. As outlined in *Cada*, which

held that when the necessary information is gathered after the claim arose but before the statute

of limitations has run, the presumption should be that the plaintiff could bring suit within the

statutory period and should have done so. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 453

(7th Cir. 1990).

33.     Such is the case here.  To the extent that the Trustee had notice of claims in time

to assert them prior to the expiration of the statute of limitations those claims should have been

timely filed.   Further, those claims are not in the nature of equitably tolled claims which

generally speaking, are discovered after the limitations period has run.   Here, applying

prospective tolling to those claims is plainly improper and not justified under the circumstances

and the Trustee elected not to file them timely at his own peril without the benefit of later

claiming equitable tolling to protect the claims.

WHEREFORE, the Debtors respectfully request that the Court deny the Motion for

Equitable Tolling and for such other relief in the Debtors' favor as is proper under the

circumstances.

**Respectfully submitted,**
**Gamal and Analida Naguib**

By: /s/ Konstantine Sparagis
One of the Debtors' Attorneys.

Konstantine Sparagis (6256702)
Law Offices of Konstantine Sparagis
900 W. Jackson Blvd., Ste. 4E
Chicago, IL 60607
PH: 312-753-6956
gus@konstantinelaw.com

# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Bankruptcy Case No. 22-3672 |
| | ) | |
| Gamal Naguib and Analida Naguib, | ) | Hon. Janet S. Baer |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | (Dupage County) |

**RESPONSE TO CREDITOR'S MOTION FOR LEAVE TO CONDUCT
EXAMINATIONS OF CERTAIN DEBTORS AND NON-DEBTORS PURSUANT TO
RULE 2004**

Now Comes Gamal S. Naguib ("Dr. Nagbuib" or "Debtor"), by and through their counsel
Konstantine Sparagis, of the Law Offices of Konstantine Sparagis, PC, and hereby Respond to
the Motion for Leave to Conduct Examinations Pursuant to Rule 2004 ("Motion") filed by
Manuel Cesar Iglesias and Manuel Cesar Iglesias, M.D.S.C. ("Dr. Iglesias" or "Creditor").  In
objection, Dr. Naguib states as follows:

**BACKGROUND**

1.     In August 2016, Dr. Iglesias filed suit against Gamal Naguib, Analida Naguib,
and Masterpiece Corporation in state court as case no: 2016CH10564  ("State Court Case").

2.     Since the filing of the state court case, Dr. Iglesias has filed five total state court
complaints and changed lawyers several times.  Upon information and belief, written discovery
in the State Court Case has closed, regardless, each time Dr. Iglesias changes attorneys, each
new set of lawyers insists on restarting the discovery process all over again, including in
connection with the instant filing.

3.     On March 30, 2022, ("Petition Date"), the Debtors filed their pending voluntary
petition for relief under chapter 7 of title 11 of the United States Code ("Bankruptcy Code").
Nevertheless, the Movant has waited 18 months since the Petition Date to file the instant Motion.

4.      On October 2, 2022, the Debtors received their discharge in this case.

5.      On November 30, 2022, this Court denied the Creditor's motion to modify the stay and denied the Creditor's motion to file an untimely adversary complaint.  A decision that remains pending on appeal, but only as to Mr. Naguib.

6.       During the State Court Case, the Creditor received either by direct production by the defendants or through subpoena almost 17,000 pages of financial documents and records covering the period 1985 to 2018. See **Exhibit A**, summary of documents produced in connection with State Court and Bankruptcy proceedings.

7.      In this case, the Debtors attended and testified at two extended 341 meetings of creditors.  The first on May 2, 2022 and the second on May 12, 2023 each of which was attended by the Creditor's prior counsel, Mr. Saffar who had the opportunity to and, in fact, questioned the Debtors.

8.      In anticipation of the first meeting of creditors and prior to the second meeting of creditors, (less than 10 days), the Debtors produced to the trustee an additional 600 pages of financial documents and records for periods covering 2019 – 2022.  See Ex. A.  And, these documents were produced either prior to the original meeting of creditors and within one week of the conclusion thereof.  In other words, the Debtors have always and fully cooperated with the trustee in his investigation.

9.      Mr. Naguib is 84 years old and has been in terrible health for years.  Mrs. Naguib is battling cancer with surgery completed as recently as one year ago.  Attached hereto as **Exhibit B** is a letter from Mr. Naguib's primary treating physician indicating that due to medical complications and physical limitations he is incapable of meaningfully participating in litigation.

10.      Moreover, the trustee in this case after having the opportunity to investigate the Debtors and being provided extensive voluntary disclosures filed an estate property report on

October 31, 2022 indicating that he had investigated 26 different categories of disclosed assets which indicated the value as $0 except for a $50,000 potential avoidance action which the Debtors themselves voluntarily disclosed in their original petition – even through the payment did not come from the Debtors, but from one of Mr. Naguib's companies, Mini Malls, LLC. On the one hand, Mr. Naguib's daughter was reimbursed for a loan made directly to Mini Malls for the purpose of staving off a foreclosure to allow the property to be sold and was repaid out of Mini Malls at the closing.

11.     Moreover, on August 22, 2023, the Debtor's provided this information to the trustee.  We have not heard back regarding his analysis of the relevant documents, which the Debtors posit are indicative and conclusive of an unavoidable transfer. Regardless, as for the delay in producing the documents, this does not fall on the Debtors – who produced this information almost one year ago.  Instead, Debtor's counsel and the trustee had (what I believe) to be a gentleman's agreement that the documents would be produced when the trustee requested them to get past the end of last year.

12.     The Creditor's Motion is factually incorrect and disingenuous.  In the Motion, the Creditor posits in paragraph 6 that:

> In the State Court Case, Dr. Iglesias obtained **limited discovery**, including certain bank records, that revealed certain aspects of Naguib's embezzlement of Dr. Iglesias's investment contributions.

Respectfully, the Debtors' production in the State Court and in this Court could hardly be described as limited.  This is simply endemic to the conclusory nature of the Motion as whole.

13.     But the Movant does not stop there, he continues Motion in paragraph 9 that:

> Notably, the Debtor's bankruptcy petition reflects that shortly before the petition date, he sold **real estate owned by Masterpiece Corporation**. It appears he did that to use the proceeds to pay his daughter $40,000 and $140,000 to the attorneys

representing him in the State Court Case. That transaction alone
raises questions that require further investigation.

However, the disclosure in the SOFA at No. 18 identifies two transactions. [Dkt#1; SOFA]. The

first transaction was engaged in by the Debtors individually and other by Mini Malls, LLC –

Masterpiece is mentioned nowhere in the disclosures, but this is apparently a key fact relied upon

by the Movant. But moreover, and as noted above, the trustee has already received the

documents relevant to the foregoing transactions – which again the Debtors self-disclosed and

which the Debtors would be willing to reasonably supplement cooperatively as they have

proceeded throughout the entirety of this case. As to the first sale, the Debtors purchased that

vacant lot in their own names in 1985 well before any allegations of fraud, and then sold it.

There is no nexus between that property and Dr. Iglesias, and none has ever been intimated or

alleged.

14. Finally, the Motion outlines two basic transactions which they suggest provide

cause to continue in the Creditor's belated and scorched earth approach towards these Debtors –

despite more than 17,000 pages of discovery being produced to them. First, the transactions

identified in Paragraph 9 as disclosed in the SOFA as outlined above and then, almost $70,000 in

transactions identified in Paragraph 13 of the Motion as payments to James Anthony, his son

which his son would testify were for wages for services performed. As to the latter transactions,

the Creditor has known about these transactions since at least March of 2020 because those same

allegations were identified in the Creditor's 3rd Amended Complaint at Paragraphs 190 and 191.

Regardless, this is the first time these allegations have reared their head in these proceedings, but

the Debtors posit that even assuming arguendo those transfers were fraudulent as opposed to an

ordinary and legitimate business expense their recovery would amount to less than one tenth of a

percentage recovery for the estate, and by definition – de minimis.

# ARGUMENT

## A. Dr. Iglesias Has Failed to Establish Good Cause Necessary for Rule 2004 Examination of Dr. Naguib or Any Third Party

15.     More than 18 months after the Petition Date, and after the Debtors received their discharge, Dr. Iglesias has again changed lawyers which must mean it is time to restart discovery which has been ongoing between the parties since at least 2016.  Keeping in mind that Dr. Iglesias' bankruptcy counsel is also his state court counsel – presumably with access to the state court production identified in Exhibit A, the Creditor has now decided to restart discovery – much, if not all, of which has been already produced either in state court or to the trustee in this case.

16.     As pretext for the Motion, Movant asserts purportedly "limited" access to discovery and direct the Court to two transactions which the Debtors themselves disclosed in their petition which the case trustee has presumably had the opportunity to fully investigate by cloaking their request under the guise of Rule 2004.

17.     Here, the Debtors posit that the sole purpose of this Motion is to harass and punish the Debtors and their family members.  *Snyder v. Soc'y Bank*, 181 B.R. 40, 42 (S.D. Tex. 1994), aff'd sub nom. In re Snyder, 52 F.3d 1067 (5th Cir. 1995) (holding examinations under Rule 2004 cannot be used to harass or oppress the party.)  Other courts have readily understood the potential for abuse under Rule 2004 to harass and abuse debtors by adverse parties under the pretext of assisting the estate in "uncovering" fraudulent conduct of the debtor given.  See *In re J & R Trucking, Inc.*, 431 B.R. 818, 821 (Bankr. N.D. Ind. 2010) (citing to Norton Bankruptcy Rules and acknowledging that "[o]ne can readily visualize a situation where creditors may want to use this section to deal with their special problems and use the section as a substitute for discovery.")

18.     The Motion is technically correct that, in general, the scope of a Rule 2004 examination is so broad that it "can legitimately be in the nature of a 'fishing expedition' [and] extend to creditors and third parties who have had dealings with the debtor." *In re Wilcher*, 56 B.R. 428, 433 (Bankr. N.D.Ill. 1985).  However, a Rule 2004 examination "is not without limits." *Wilcher*, 56 B.R. at 433.

19.     Here, even assuming arguendo that the request presents a facially valid basis for the examination (it does not), Rule 2004 still "requires the court to exercise its discretion and balance the competing interests between the examiner's right to expose alleged chicanery and [the third party's] right to privacy in his business affairs." *Wilcher*, 56 B.R. at 434 (citing *In re Vantage Petroleum Corp.*, 34 B.R. 650, 651 (Bankr. E.D.N.Y. 1983).  "In the absence of any actual evidence of duplicity, [the third party] is not properly subject to a Rule 2004 examination." *Wilcher*, 56 B.R. at 434.

20.     Here, the sum total of the "duplicity" outlined in the Motion are two disclosed transactions which the trustee has had ample opportunity and which the Debtors and their family have fully cooperated in assisting his investigation and some payments to the Debtor's son for work he or his business performed 8 years ago which even if fraudulent and fully recovered which is always doubtful, would result in less than a .7% recovery for the estate.

21.     The Debtor posits that an improper purpose here can be inferred from the Motion as the movant fails to provide a legitimate reason for conducting the examination. *See, e.g., Musicians Union, AFM Local 6 v. Lewis (In re Lewis)*, No. C-93-3893 MHP, 1994 WL 125201, at *3 (N.D. Cal. Mar. 31, 1994); *See In re Wilcher*, 56 B.R. 434 (Bankr. N.D. Ill. 1985) (holding that a party was "not properly subject to a Rule 2004 examination" due to the absence of any actual evidence of the alleged wrongdoing).  Here, the Debtors have outlined above that the

purported basis for Dr. Iglesias' belated investigation is merely pretextual and not a legitimate basis for granting the Motion.

22.    To establish "good cause" the movant must demonstrate that the "requested documents are necessary to establishment of the moving party's claim or that denial of production would cause undue hardship or injustice." *In re Dinubilo*, 177 B.R. 932, 940 (E.D. Cal. 1993). In this case, the Movant has failed to make a sufficient showing to meet either prong of the "good cause" standard.  Here, Dr. Iglesisas' efforts fail miserably on both fronts.  First, his "claims" whatever they may be, have been discharged and are moot.  Second, Exhibit A speaks for itself regarding the breadth, scope and volume of documents produced both in this and the State Court Case. In that regard, the sole parties that will suffer undue hardship or injustice are the Debtors, their family members and third parties who will now be directly subjected to the abusive investigation of Dr. Iglesias which has already proceeded for 7 years and resulted in thousands of pages of financial data regarding Dr. Naguib and his businesses – including his family members.

23.    While not binding on this Court, the court in *J&R Trucking* provided a thoughtful analysis when confronted with similar issues pertaining to a motion for 2004 examination. *In re J & R Trucking, Inc.*, 431 B.R. 818, 822 (Bankr. N.D. Ind. 2010).  There, the court denied the movant's request for 2004 examination of third parties by plainly concluding that:

> "While the court may understand their curiosity, there is nothing the movants could do with that information once they got it. They could not act upon it, or seek to recover any such transfers; the trustee has the exclusive right to do so. *Matter of Perkins,* 902 F.2d 1254, 1258 (7th Cir.1990) (If a third party tries to prosecute a cause of action belonging to the trustee, the action should be dismissed.). So, in that sense, their examination can serve no real purpose. While movants may genuinely want to help the trustee, should the trustee desire that assistance, they must do so directly, acting for, at the behest of, and in the name of the trustee, and not indirectly, in a manner that treats the trustee as simply an incidental beneficiary of an endeavor actually undertaken for someone else. *Cf. Matter of Vitreous Steel Products Co.,* 911 F.2d 1223, 1231 (7th Cir.1990)

(trustee may accept help from creditors but creditors may not act in their own name to protect the interests of the estate).

As for movants' desire to identify third parties who may also be liable to them, that, quite simply, is neither this court's concern nor the purpose of Rule 2004. *Cf., In re Doctors Hospital of Hyde Park, Inc.,* 308 B.R. 311, 317–18 (Bankr.N.D.Ill.2004) (bankruptcy court has no jurisdiction over creditor's action to collect from third parties). No matter how artfully one tries to disguise the requested examinations, by dressing them up in the robes of bankruptcy administration, their real purpose is to identify another entity movants might be able to collect from, and whether those efforts would have any impact on the bankruptcy estate is of no real concern to them. Movants understandably want to their money, but that does not justify turning a tool that has been developed to efficiently administer bankruptcy estates into a private collection device for creditors. Movants have other tools and other fora which they can use to investigate their rights against third parties and to collect the amounts they are owed. They should use them and not Rule 2004."

*In re J & R Trucking, Inc.*, 431 B.R. 818, 822–23 (Bankr. N.D. Ind. 2010).

24.     The foregoing analysis is equally applicable and relevant to the case at bar and the Motion should be denied for the same reasons. Given the totality of the circumstances as outlined above, the Debtors posit that the primary, if not sole purpose, of this Motion is to find more defendants for the Creditor to add to their frivolous state court suit for the purpose of further harassing the Debtors and their loved ones which is facially improper under Rule 2004.

25.     More analogous to the case at bar and equally persuasive is the *Kleynerman* case. There, the court held that debtor's former business partner was not entitled to Rule 2004 examination of debtor and other co-owners of successor business entity in order to engage in wide-ranging inquiry into transactions occurring years earlier. *In re Kleynerman*, 617 B.R. 122 (Bankr. E.D. Wis. 2020). In denying the creditor's request, the court relied on three factors relevant to the case at bar to deny the Motion.  First, that "[i]nquiries that seek far-reaching information will require a higher showing of good cause because they are inherently more intrusive and present a greater potential for abuse." *Id*. at 128 citing to *In re Countrywide Home*

*Loans*, 384 B.R. 373, 393 (Bankr. W.D. Pa. 2008).  Second, whether the movant already has access to the information sought.  *Id.* at 131.  Finally, the timing of the motion.  *Id.*

26.    There each of the three considerations weighed heavily in the court's denial of the motion and went to the heart of the good cause inquiry.  There as here, the movant, a disgruntled state court litigant, (i) sought extensive and broad discovery against a multitude of parties, (ii) had access to much of the information they purportedly sought due to years of litigation prior to the bankruptcy; and (iii) failed to act on that information until after the debtor's discharge had been entered and months after they had learned of the allegedly pertinent transactions 9 months before bringing the motion.  Here, the only subtle difference between the cases is that Dr. Iglesias waited even longer to petition this Court. Indeed, it is indisputable that Dr. Iglesias learned of the payments to the Debtor's son at least 2 years ***before*** the bankruptcy was filed and the remaining transactions which he purports as the "cause" for his investigation 18 months ***prior*** to bringing the Motion.

27.    Here, as pointed out above, the further interrogation by the Creditor will not assist Dr. Iglesias in establishing any "claim" – the Debtors have received their discharge. Any other claims purportedly investigated belong to the trustee.  Further, denying the request would not result in any undue hardship or injustice against Dr. Iglesias – he has already received thousands of pages of discovery and could presumably petition the state court for more.  Respectfully, if there are any deficiencies in the prior production, those matters could and should have been directed to the state court as this Court is not the proper forum for Dr. Iglesias to supplement his discovery.  For all of those reasons, Movant has failed to establish good cause and the Motion should be denied.

**B. Even Assuming the Movant has Established Good Cause, the Motion Should Be Denied Due to the Pending Proceeding Rule**

28.     Rule 2004 does not provide parties engaged in litigation the procedural, substantive and due process protections afforded under the Federal Rules of Procedure. The pending proceeding rule has been utilized by bankruptcy courts to protect against abuse through discovery which would otherwise be governed by the narrower limits of the discovery rules.

29.     In this jurisdiction, bankruptcy courts follow and apply the pending proceeding rule which is simple in its analysis and application.  To wit, "[o]nce litigation has been initiated, resort to Rule 2004 may not be appropriate; the parties must use the discovery tools provided by the civil rules. *In re Sheehan*, 625 B.R. 72, 76 (Bankr. N.D. Ill. 2021)  *In re Roman Catholic Church of Diocese of Gallup,* 513 B.R. 761, 765 (Bankr. D.N.M. 2014) ("If an adversary proceeding or contested matter is pending, the discovery rules in the rules of civil procedure should be used, rather than Rule 2004 examinations.").

30.     Bankruptcy courts have equally applied the rule to include state court proceedings as "pending proceedings." *In re Sunedison, Inc*., 572 B.R. 482 (Bankr. S.D.N.Y. 2017) (holding that "[p]ending proceeding" rule, that discovery should be pursued under the Federal Rules of Civil Procedure and not by Rule 2004 examination once an adversary proceeding or contested matter has commenced, also applies when the pending proceeding is state court litigation. Fed. R. Civ. P. 1 et seq.; Fed. R. Bankr. P. 2004) See also, *Snyder v. Soc'y Bank*, 181 B.R. 40, 42 (S.D. Tex. 1994), aff'd sub nom. In re Snyder, 52 F.3d 1067 (5th Cir. 1995).

31.     Here, there is and has been a state court proceeding pending since 2016 and the request should be denied on the basis of the pending proceeding rule.

WHEREFORE, the Debtors respectfully request that the Court enter an Order denying the request for a Rule 2004 examination as to the Debtors and non-debtors and providing such other relief in the Debtors' favor as is proper under the circumstances.

**Respectfully submitted,**
**Gamal and Analida Naguib**


By: /s/ Konstantine Sparagis
One of the Debtors' Attorneys


Konstantine Sparagis (6256702)
Law Offices of Konstantine Sparagis
900 W. Jackson Blvd., Ste. 4E
Chicago, IL 60607
PH: 312-753-6956
gus@konstantinelaw.com

EXHIBIT A

| Subpeona List | Date of Subpeona | Date Range of Documents Produced | Type of Document Produced | Party Reuesting Subpeona | Approximate Number of Documents produced |
|---|---|---|---|---|---|
| Charles Schwab Acct 6686, 3822, 3824, | 3/9/2016 | 9/8/1999-12/31/16 | Masterpiece Gamal "James or Jim" Naguib's financial statements, checks, documents all in posession of Charles Schwab | Ettinger & Beskos, P.C. | 8,230 |
| Charles Schwab Acct 6686, 3822, 3824, 6684 | 9/26/2018 | 9/8/1999-2018 (TBD) | Masterpiece Gamal "James or Jim" Naguib's financial statements, checks, documents all in posession of Charles Schwab | Karnig Kerkonian | tbd |
| Gates Dental Care PC | 12/30/2019 | 1999-TBD | Photographs, emails, financial | Jeffrey Blumenthal Chartered | 325 |
| Oral Carefirst Inc | 12/30/2019 | 2012-TBD | trademarks, vendor communications | Jeffrey Blumenthal Chartered | 33 |
| Taha Elghawaby | 10/26/2016 | 2010-2011 | Accounting | Karnig Kerkonian | 65 |
| Raed Sweiss | 8/30/2017 | 4/17/2013-1/28/2014 | Accounting | Karnig Kerkonian | 87 |
| Todd Zastrow | 8/22/2017 | 1999-12/31/200 | Accounting | Karnig Kerkonian | 90 |
| Lee Williams | 5/25/2021 | 1/2/2008-12/31/2016 | Accounting | Freeborn and Peters | 178 |
| Bernie Brady Associates | 11/22/2021 | 2015-tbd | Accounting | Freeborn and Peters | 439 |
| **Total Documents** | | | | | **9,447** |

| Type of document produced | Approximate Number of Documents Produced | Date Produced | Approximate Document Date Range Produced | Account Type and Number Gamal "James or Jim" Naguib |
|---|---|---|---|---|
| Bank Statements, Checks, and financial records | 3788 | 9/9/2016 | 5/1/1985-12/31/2016 | Charles Schwab Acct # 6686 & #6684 |
| Bank Statements, Checks, and financial records | 1189 | 9/9/2016 | 12/10/91-12/31/16 | Charles Schwab Acct # 3822 |
| Bank Statements, Checks, and financial records | 1350 | 9/9/2016 | 10/8/91-12/31/2016 | Charles Schwab Acct# 3824 |
| Work products with Iglesias, Stamp account, Loans, classifications of Expenses and Interest on personal loan | 542 | 5/11/2021 | 2005-TBD | Charles Schwab #6686 |
| Tax returns Masterpiece and personal returns | 179 | 12/27/2016 | 2003, 2004, 2005,2006, 2007,2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015 | See Tax Production bates labled Blackwell 03'-15' |
| $850,000 dollar settlement letter produced by Gamal "James or Jim" Naguib "Briggs Vs. Iglesias" to pay off loan to Acct #6686 | 27 | 5/11/2021 | 6/12/2012-TBD | |
| Checks written between Masterpiece and NT | 459 | 9/9/2005 | 2015-2016 | Northern Trust Acct # 7153 |
| | **7048** | | | |

| James Anthony (Wrongfully served as James Naguib on Dr. Naguib's email see SAC) Documents produced | Type of Document Produced | Approximate # of Documents Produced | Date Produced | Approximate Date Range of Documents Produced | Account Number and Type James Anthony |
|---|---|---|---|---|---|
| Name Change | Court order of Name Change July 2000 | 1 | 1/31/2019 | 7/17/2000 | |
| Work products and correct email | James.a.anthony@gmail.com NOT jamesnaguib@gmail.co | 17 | 9/10/2020 | 8/12/2009-11/26/12 | |
| Anthony Realty | License, checks between Masterpiece and Anthony Realty | 97 | TBD | 2015-2016 | Anthony Realty Acct# 2488 |
| Raed Sweiss communication (Interactive media, LLC) | Proof James Anthony spoke with Raed Sweiss on interactive medial LLC not Iglesias and email is not jamesnaguib@gmail.com | 13 | 9/10/2020 | 1/13/2014-2/21/15 | TBD |
| **Total** | | **128** | | | |

| Documents Produced by Gamal "James or Jim" Analida Naguib | Type of Document produced | Approximate Number of Documents Produced | Approximate Document Date Range produced | Account Type and Number or document |
|---|---|---|---|---|
| Gamal "James /Jim" Naguib & Analida Naguib Schwab Acct#3822 | Bank Statements, Checks, and financial records | 113 | 3/30/2021 1/1/2021-12/31/22 | Charles Schwab Acct #3822 |
| Personal and Corporate Tax Returns 2019 | Tax Returns | 21 | 3/30/2021 1/1/2019-12/31/19 | Tax Returns |
| Personal and Corporate Tax Returns 2020 | Tax Returns | 61 | 3/30/2021 1/1/2020-12/31/2020 | Tax Returns |
| Account Statements for all accounts listed on Debtors Schedule A/B | Bank Statements, Financial Records | 48 | 5/9/2022 1/1/2021-12/31/2022 | Citibank |
| Copy of Closing Statements Mini Malls, LLC | Closing statement and Financial Records | | 5/9/2022 1/1/2021-12/31/2022 | First Merchant Bank |
| List of Accounts Receivable and Bank Statements For Gates Dental Car | Bank Statements, Financial Statements, 2 years | 140 | 5/9/2022 1/1/2021-12/31/2022 | Citibank |
| Maturity Demand and Default (Mini Malls LLC) By Devon Bank | Devon Bank Default and Maturity Demand | 3 | 5/9/2022 3/21/21-8/12/21 | First Merchant Bank |
| Default Foreclosure Notice Devon Bank | Devon Bank Default Notice | 2 | 5/29/2021 3/21/21-5/29/21 | |
| Deborah Naguib tracing of funds of her IRA to Mini Malls LLC | Financial Statements IRA Deborah Naguib funds to Mini Malls LLC to avoid Foreclosure | 4 | 3/30/2021 12/10/20-2/3/22 | Charles Schwab Acct #3823 |
| Masterpiece Tax Return 2019 | Tax Returns | 15 | 3/30/2021 1/1/2019-12/31/2019 | Tax Returns |
| Masterpiece Tax Return 2020 | Tax Returns | 26 | 3/30/2021 1/1/2020-12/31/2020 | Tax Returns |
| Associated Bank | Financial records and Bank Statements | 24 | 3/30/2021 1/1/20-3/31/21 | Acct #8558 |
| First Merchants Bank Account (Mini Malls, LLC) | Financial records and Bank Statements | 25 | 3/30/2021 1/1/20-12/31/21 | Acct #6664 |
| JP Morgan Chase Gamal "James or Jim" Personal Account | Financial records and Bank Statements | 28 | 3/30/2021 1/1/20-12/31/21 | Acct #2802 |
| Northerntrust Personal Account Gamal "James or Jim" Naguib | Financial records and Bank Statements and copies of checks | 45 | 3/30/2021 1/1/2020-4/5/21 | Acct #7153 |
| Personal Charles Schwab Gamal "James or Jim" Naguib | Bank Statements and Financial Statements | 113 | 3/30/2021 1/1/2020-4/5/21 | Acct #3822 |

# EXHIBIT 2



**AT THE FOREFRONT**
# UChicago Medicine

**SECTION OF CARDIOLOGY**
**ADVANCED HEART FAILURE PROGRAM**
**CARDIAC TRANSPLANT SERVICE**
5841 S. Maryland Ave., Rm. A621, MC2016
Chicago, IL  60637
773-702-9461

**GENE H. KIM, MD**
*Interim Director*, Advanced Heart Failure &
Transplantation
Associate Professor of Medicine

**NITASHA SARSWAT, MD**
Assistant Professor of Medicine
Director of Cardiac Amyloid and
Infiltrative Cardiomyopathy

**SARA KALANTARI, MD**
Assistant Professor of Medicine
Director of Cardiopulmonary Exercise
Stress Laboratory
Heart Failure Fellowship Program Director

**ANN NGUYEN, MD, FACC**
Assistant Professor of Medicine

**JONATHAN GRINSTEIN, MD, FACC**
Associate Professor of Medicine
Dir., Mechanical Circulatory Support Program
Dir. of Research for Advanced Heart Failure

**BOW YOUNG CHUNG, MD**
Assistant Professor of Medicine

**MARK BELKIN, MD**
Assistant Professor of Medicine

**STANLEY SWAT, MD**
Assistant Professor of Medicine

**NURSE PRACTIONERS-TRANSPLANT**
Catherine Murks, PhD, APN
Tiana Riley, MSN, RN, ACNP-BC
JoDel Powers, MSN, RN, FNP-BC
Andrea Jones MSN, FNP-BC

**NURSE PRACTIONERS-HEART FAILURE**
Elizabeth Hushka, MSN, FNP-BC
Alejandra Rivera, DNP, APRN, FNP-B CCRN
Lauren Bowles, MSN, FNP-BC

**NURSES-HEART FAILURE**
Melissa Goldberg, RN
Samantha De Santiago, RN
Mark Kirksy, RN

**PRE-TRANSPLANT COORDINATORS**
Juanita Harris, RN
Michele Sadzak, RN, MSN

**PULMONARY HYPERTENSION**
Lira Palen, MSN, APRN, AGACNP-BC
Tamika Hinton, BSN, RN

To Whom It May Concern,

Gamal Naguib 5/1/1939

I am writing to provide documentation in support of the disability of Mr. Gamal Naguib, a patient under my care who presents with complex medical conditions requiring ongoing management and support.

Mr. Gamal Naguib, an 84-year-old male, has a significant medical history that includes heart failure with preserved ejection fraction, coronary artery disease, status post-drug-eluting stent placement, chronic atrial fibrillation post-ablation, and a history of left bundle branch block. Despite his age, Mr. Naguib engaged in his medical care, attending routine follow-up appointments accompanied by his son.

During his recent visit, Mr. Naguib reported increased fatigue compared to his baseline, along with worsening dyspnea on exertion and gait imbalance. He also described debilitating shortness of breath triggered by minimal stressors, leading to a rapid increase in heart rate. Furthermore, there have been noted concerns regarding memory issues, possibly indicating a progressive decline. Mr. Naguib is being referred to geriatric neurology for further evaluation and management. Additionally, he was hospitalized for gastrointestinal bleeding earlier in August and underwent an esophagogastroduodenoscopy with cautery and clipping of a bleeding gastric arteriovenous malformation.

Given the complexity of Mr. Naguib's medical conditions and the need for ongoing specialized care, it is imperative to ensure continued support and assistance to optimize his quality of life. Due to his health condition, Mr. Naguib is currently unfit to participate in court proceedings or legal actions.

Please do not hesitate to contact me if further information or clarification is required.

**Gene Kim, MD**
Assistant Professor of Medicine
University of Chicago Medicine
Center for Advanced Heart Failure Management & Transplant Services
5841 S Maryland Avenue Chicago IL 60637
Phone 773-702-9461
Fax    773-834-1764

CamScanner

# EXHIBIT 3

Dr. C. Tia Michaud, M.D.
1240 Iroquois Ave Ste 200
Naperville, IL 60563
Ph: 312.752.8426 Fax: 312.872.8896

April 9th, 2024

To Whom It May Concern:

Deborah Naguib (6/5/75) is a patient under my longterm psychiatric care. She has a diagnosis of Bipolar disorder, type 1, which is a very serious mental illness. I met her almost 14 years ago after her 4th psychiatric hospitalization. At the time, she was very heavily medicated with a combination of antipsychotics and mood stabilizers. She was able to wean down to her current medication of depakote (currently at 625mg daily, divided) and diphenhydramine 50mg as needed. She has been stable during the time I have treated her, with brief hypomanic episodes in response to severe psychosocial stressors, which have been almost if not exclusively triggered by ongoing litigation which Ms. Naguib and her family have been fighting for many years.

On March 25th, 2024, I evaluated Ms. Naguib shortly after she was deposed by opposing counsel. She (as well as her attorney and her brother) described that Ms. Naguib was not allowed a break, and that her distress was not registered until it led to a progressive panic attack that resulted in a short-lived catatonia. Fortunately she was able to recover after several hours/days, but this was by no means a guaranteed outcome.  I ask the court to understand that Ms. Naguib's response to her deposition was severe, and placed her at serious risk of a relapse. It is my very strong clinical opinion that Ms. Naguib is not now, and will not be in the future, able to tolerate a deposition without similar decompensation and likely need for hospitalization.

Respectfully,

C. Tia Michaud, M.D.

